IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SENECA SMITH | ) | |
| (a.k.a. ROGER WILLIAMS) (K-76299) | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10 C 5169 |
| | ) | |
| | ) | Judge Elaine E. Bucklo |
| LIEUTENANT GALAN, SERGEANT | ) | |
| THIELEN, OFFICER WALTON, | ) | |
| SERGEANT ATKINS, SERGEANT THOMS, | ) | |
| and SUPERINTENDENT HICKERSON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Seneca Smith (also known as Roger Williams), is incarcerated at Stateville Correctional Center. Naming eight Cook County Jail officers and officials as Defendants in his amended 42 U.S.C. § 1983 complaint (his original complaint listed over 80 defendants), Plaintiff alleges that officers failed to protect him from an attack by other inmates on February 18, 2010. On initial review of the amended complaint, the Court allowed Plaintiff to proceed against Lieutenant Galan, Sergeant Thielen, Sergeant Atkins, Sergeant Thomas, Officer Walton, and Superintendent Hickerson ("Defendants"), and dismissed the other officers. Currently before this Court are Defendants' motion for summary judgment and their motion to strike statements in Plaintiff's declaration filed with his response because they contradict his deposition testimony. For the following reasons, the Court grants Defendants' motion to strike, grants in part and denies in part their motion for summary judgment, and dismisses the claims against Sergeant Thielen, Lieutenant Galan, and

Superintendent Hickerson.  Plaintiff may proceed with his claims against Sergeant Atkins, Sergeant Thomas, and Officer Walton.

## STANDARD OF REVIEW

This Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In determining the existence of a genuine issue of material fact, this Court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The party asserting that a fact is not genuinely disputed, "must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).  If the moving party meets its burden of showing that no issue of material fact exists, the non-moving party must "go beyond the pleadings and by h[is] own affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks and citation omitted); *see also Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006).  A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Carrroll v. Merrill Lynch*, __ F.3d __, 2012 WL 4875456 at *3 (7th Cir. Oct. 16,

2012). Rather, a genuine issue of material fact exists only if a reasonable finder of fact could return a decision for the nonmoving party based upon the record. *See Anderson*, 477 U.S. at 252; *Insolia v. Phillip Morris Inc.*, 216 F.3d 596, 598-99 (7th Cir. 2000).

When addressing a summary judgment motion, this Court derives the background facts from the parties' Local Rule 56.1 Statements, which assist the court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). Because Plaintiff is proceeding *pro se*, the Defendants served him with a "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment" which explained to Plaintiff how to respond to Defendants' summary judgment motion and Rule 56.1 Statement, as well as the consequences of failing to respond properly. *See* N.D. Ill. Local Rule 56.2.

This Court may consider a Rule 56.1 factual statement that is supported properly by the record to be true if the non-moving party either does not respond to it, offers only an evasive denial, or does not adequately cite to the record for his response. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006); *Cichon v. Exelon Generation Co., L/L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005); *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997); *see also* Rule 56(e).

In the present case, Defendants filed a Rule 56.1 Statement and provided notice to Plaintiff of his need to respond. (R. 85, Defs. Rule 56.1 Statement and R. 86, Notice to Pro Se Litigant.) Plaintiff has responded to Defendants' Rule 56.1 Statement of Facts, has submitted a list of disputed facts, and has submitted his own declaration of facts upon which he bases his disputed facts. (R. 94, Pl. Rule 56.1 Statement.) Defendants seek to strike Plaintiff's declaration statements that he informed officers that he wanted to be placed in protective custody. (R. 99.) Defendants contend that these declaration

statements contradict Plaintiff's deposition testimony that he never wanted protective custody and, thus, are allegedly Plaintiff's "attempt to create 'sham' issues of facts." (R. 99 at 2-5.)

Although plaintiffs may rely on their own statements where those statements are made in an affidavit or otherwise sworn to under penalty of perjury, *see Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004), plaintiffs may not create "'sham' issues of fact with affidavits that contradict their prior depositions." *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005). "Consequently, where a deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Velez v. City of Chicago*, 442 F.3d 1043, 1049 (7th Cir. 2006) (internal quotation marks and citation omitted). The Court addresses the alleged contradiction after its discussion of the facts and evidence of this case.

## FACTS

In February 2010, Plaintiff was a pretrial detainee being housed in Division 10 at the Cook County Jail. (R. 85, Defs. Rule 56.1 Statement of Fact ("SOF") ¶ 8.) Plaintiff was a member of the Four Corner Hustlers, a Chicago gang that was affiliated with the Vice Lords, a larger Chicago gang. (Def. SOF at ¶ 9.) According to Plaintiff, kites ("messages ... from gang members") were being passed around from other gangs to harm or kill Plaintiff because he was thought to be a snitch. (R. 85, Exh. C, Pl.'s Depo. at 101.) As described by Plaintiff in his deposition, "the kites were saying, every time you see him, hurt him," (*id.* at 107.), and were being sent to members of the Almighty Vice Lords and the Finball (a term used by Plaintiff to refer to multiple gangs "Blackstones, Stones, [Latin] Kings").

(*Id.* at 102, 107.) Plaintiff estimated that kites directing to harm him were being sent by and received by "40% of the jail." (*Id.* at 108, 109.).

On February 18, 2010, Plaintiff was assaulted by another inmate in the barber shop of Division 10 of the jail. (Defs. SOF ¶ 10.) Sometime later, Plaintiff was being transferred from Division 10 to Division 9. (*Id.* at ¶ 11.) Division 9 houses inmates who have received a disciplinary ticket and have been sent to segregation, as well as, according to Plaintiff, inmates in general population and protective custody. (*Id.* at ¶ 12; R. 94, Pl. SOF at ¶ 12.) Detainees being transferred between divisions must be processed through Division 5, commonly known as the "RCDC" unit, an area of the jail that is separate from Divisions 9 and 10. (Defs. SOF ¶¶ 13, 24.)

Prior to going to the RCDC unit, Plaintiff was taken to the intake area of Division 10, where he saw Lieutenant Galan and Sergeant Thielen. (*Id.* at ¶ 14.) From the intake area of Division 10, he was taken to the RCDC unit of Division 5. Plaintiff does not remember the name of the officer who escorted him. (Defs. SOF ¶ 21; Pl. SOF ¶ 21.) The RCDC unit consists of five or six holding cells with either one or two officers. (Defs. SOF ¶ 22; Pl. SOF ¶ 22.) Officer Walton was working on the RCDC unit on February 18, 2010, and placed Plaintiff in bullpen three. (*Id.* at ¶¶ 25-27.) According to Plaintiff, he heard the other inmates in his bullpen whisper "that's the guy" or "that's our guy." (*Id.* at ¶¶ 34, 35; Pl. SOF ¶ 35.) Sometime later, Plaintiff saw Sergeant Thomas walking through the RCDC unit. At the time, no incident had occurred. (Defs. SOF ¶ 37.) Plaintiff stated in his deposition that he told Thomas that there were inmates in the bullpen who wanted to harm Plaintiff. According to Plaintiff, he asked Thomas to take him out of the bullpen but did not request to be placed in protective custody. (R. 85, Exh. C, Pl. Depo. at 111.)

Twenty to thirty minutes after Plaintiff was placed in the bullpen, he was attacked from his "blind side." (Defs. SOF ¶ 40.) Plaintiff states that he was knocked unconscious and he awoke while inmates were hitting his face, head, and body. (R. 94, Pl. Decl. ¶ 33.) Hearing noises from Plaintiff's bullpen, Officer Walton arrived, saw that Plaintiff was bleeding from his mouth and nose and had swelling under his right eye, and removed Plaintiff from his cell. (Defs. SOF ¶¶ 41-42; Pl. SOF ¶¶ 41-42.) Plaintiff identified five inmates as his attackers. Walton wrote disciplinary reports for each of them. (R. 85, Defs. SOF ¶ 44.) Walton also notified Sergeant Atkins of the incident. (*Id.* at ¶ 45.) Plaintiff was asked on video whether he wanted protective custody, which he refused. (*Id.* at ¶ 47.) Plaintiff stated in his deposition that he "never wanted [protective custody]." (R. 85, Exh. C, Pl. Depo. at 114.) Plaintiff's front tooth was knocked out during the attack, and he was sent to Stroger Hospital for medical treatment. (Defs. SOF ¶¶ 46, 51.) According to Plaintiff, he was placed in protective custody upon his return to the jail. (R. 94, Pl. Decl. ¶¶ 47-48.)

Most of the above stated facts are undisputed. The disputed facts mainly involve whether Plaintiff told officers that he was being threatened. In his declaration submitted with his response to Defendants' Rule 56.1 Statement, Plaintiff states that, after the assault in the barber shop, Sergeant Farris (not a defendant) asked Plaintiff if he wanted to be placed in protective custody. (R. 94, Pl. Decl. ¶ 19.) Farris allegedly said that he thought Plaintiff was safer in Division 10 than in protective custody. (*Id.*) Plaintiff's declaration states that he refused protective custody in a videotaped interview with Farris, (*id.* at ¶ 20), but later changed his mind and asked Thielen and Galan for protective custody. (Pl. Decl at ¶ 25.) According to Plaintiff, Sergeant Thielen, and Lieutenant Galan discussed the kites (gang messages) circulating in the jail to harm Plaintiff, that both officers were aware of the threats, but that neither offered protective custody. (*Id.* at ¶¶ 24, 26.) In his deposition, Plaintiff stated Thielen

and Galan told him that they would let the receiving officers know about the threats. (R. 85, Pl. Depo. at 104.) According to Plaintiff, while messages to harm him were circulating throughout the jail, they were mainly in Divisions 1, 10, and 9, which he told to Thielen and Galan. (*Id.* at 104-05.)

Plaintiff stated in his deposition that, when he arrived at the RCDC unit, he informed Sergeant Atkins and Officer Walton that kites instructing to harm him were circulating to inmates throughout the jail and he thought some of them were in the bullpen. (*Id.* at 108-09.) Plaintiff estimated that 40% of the bullpen's occupants were gang members who had been informed to harm him. (*Id.* at 109.) Plaintiff also testified that he told Sergeant Thomas about the threats when Thomas passed by Plaintiff's cell sometime before the attack. (*Id.* at 111.)

According to Galan's and Thielen's answers to interrogatories, neither was aware of threats against Plaintiff prior to February 18, 2010, and neither recall having a conversation with Plaintiff that day. (Defs. SOF ¶ 19, citing Exh. E, p.2 of Galan's and Thielen's answers to interrogatories.) They both contend that, if they had personal knowledge of threats against Plaintiff, they would have offered him protective custody. (Defs. SOF ¶ 20, citing Exh. E, p.2.) In an affidavit, Officer Walton states that he does not remember Plaintiff saying anything about his safety or protective custody. (Defs. SOF ¶ 30.) According to Walton, if Plaintiff had made known of any threats to his safety, Walton would have offered Plaintiff protective custody, which would have resulted in Plaintiff being placed in a solitary cell, instead of the bullpen, followed by a transfer to Division 11. (R. 84, Exh. D, Walton Aff. ¶¶ 11-12.) Sergeant Thomas states in his interrogatory responses that he saw Plaintiff in the bullpen in RCDC, but they never spoke before the attack. (Defs. SOF ¶ 39, citing Exh. G.) There are no discovery responses or affidavits from Sergeant Atkins in the record.

With respect to Plaintiff's declaration statements that he requested protective custody from Defendants Thielen, Galan, Walton, and Atkins, the Defendants correctly note that these statements contradict Plaintiff's deposition testimony. During his deposition, Plaintiff stated that he denied protective custody after the attack in the bullpen and that he never wanted it.

Q: You denied protective custody didn't you after the attack?

A: Denied protective custody?

Q: You didn't want it.

A: No. I never wanted it.

Q: Why didn't you want protective custody after these kites were going after you?

A: I didn't care. I wanted to die, honestly. I didn't care. They could kill me all they wanted. I take psych meds. I had problems. I didn.t care.

(R. 85, Exh. C, Pl. Depo. at 114.)

The beginning of Plaintiff's declaration supports his deposition testimony that he never wanted protective custody, as he explains that he was offered it earlier on the day of the attack by Officer Farris, but that Plaintiff believed that he was safer in Division 10. (R. 94, Exh. A, Pl. Decl. ¶ 19.) Plaintiff states that he changed his mind and that he told Defendants Thielen, Galan, Walton, and Atkins that he wanted protective custody. (*Id.* at ¶¶ 24, 25, 30, 31.) However, Plaintiff's current declaration assertions that he wanted and requested protective custody contradict his earlier deposition testimony that he "never wanted it (protective custody)." (R. 85, Exh. C, Pl. Depo. at 114.) Accordingly, Defendants' motion to strike Plaintiff's declaration statements that he asked for protective custody is granted, and the Court will consider Plaintiff's deposition testimony for this fact. The Court notes, however, that whether Plaintiff asked or did not ask for protective custody does not matter for

the Court's decision whether he may proceed with his claims of deliberate indifference against the Defendants.

## DISCUSSION

Jail officers have a duty to protect detainees from violence at the hand of other inmates. Liability based upon a breach of such a duty, however, exists only if (1) the inmate faced a substantial risk of serious harm and (2) the officer deliberately disregarded that risk. *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)); *Santiago v. Walls*, 599 F.3d 749, 758 (7th Cir. 2010). The first prong is an objective one, and the risk of harm must have been objectively serious. The second prong is subjective, such that the inmate must be able to prove that the officer both knew the inmate faced a "substantial risk of serious harm" and "disregard[ed] that risk by failing to take reasonable measures to abate it." *Grieveson*, 538 F.3d at 777 (quoting *Farmer*, 511 U.S. at 847). To rise to the level of deliberate indifference, the officers "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Given that Plaintiff was attacked and that his attack resulted in him being knocked unconscious, being beaten about his face and body, and losing a tooth, the objective component of the failure-to-protect test has been met. Plaintiff did in fact face a substantial risk of serious harm. *See Grieveson,* 538 F.3d at 775; *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (addressing a failure to protect claim, the Seventh Circuit has held that when the attack actually occurred, "the objective prong is satisfied"). The focus of this case, as in almost all failure-to-protect cases, is whether Defendants were aware of the risk of harm and whether they failed to take reasonable action to abate that risk.

Defendants contend that Plaintiff cannot establish deliberate indifference because his fear of attack was too general a threat and because his refusal to be placed in protective custody defeats his claim.

An inmate's vague or nonspecific communications of a threat provides insufficient notice to an officer of a need to protect. *Dale v. Poston*, 548 F.3d 563, 568 (7th Cir. 2008). The inmate must demonstrate that the defendants had "actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997). "[A]s the vagueness of a threat increases, the likelihood of 'actual knowledge of impending harm' decreases." *Dale*, 548 F.3d at 569 (quoting *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005)).

**Defendants Thielen and Galan:**

The fact that Plaintiff did not specifically identify his potential attackers but instead indicated that he had been targeted by all members of several gangs may not prevent him from asserting deliberate indifference against Thielen and Galan. *Brown v. Budz*, 398 F.3d 904, 915 (7th Cir. 2005) ("deliberate indifference may be found though the specific identity of the ultimate assailant is not known in advance of assault"), citing *Farmer*, 511 U.S. at 843 ("it does not matter whether the risk comes from a single source or multiple sources"); *Langston v. Peters*, 100 F.3d 1235, 1238-39 (7th Cir. 1996) (deliberate indifference may be based upon an officer's knowledge that inmates have been targeted by gangs). The issue with respect to Thielen and Galan is not who Plaintiff's attackers were, but rather, where.

Although Plaintiff indicates that messages to harm him were circulating throughout the jail, he states that he specifically informed Thielen and Galan that the kites mainly existed in "Divisions 9, 10.

Division 1." (R. 85, Pl. Depo. 105.) Plaintiff testified that he "told them (Thielen and Galan) that [he] couldn't go to 9 because these guys were going to try to kill me and stuff like that. And this is where the main source came from." (*Id.* at 103.) Nowhere in his deposition did Plaintiff indicate that he, Thielen, and Galan discussed threats existing in the RCDC unit in Division 5. Plaintiff's declaration further demonstrates that he did not inform Thielen and Galan of threats in the RCDC unit as he states that he told Thielen and Galan "that if you transfer me to division 9, ... [they're] going to try to kill me over there. That's where the Chiefs are at and the main source of where the kites are coming from." (R. 94, Pl. Decl. ¶¶ 24-25.) The parties do not dispute that the "RCDC area is a completely separate area of the jail which does not include Division 9, Division 10, Division 1." (Defs. SOF ¶ 24; Pl. SOF ¶ 24.). Although facts are disputed as to whether Thielen and Galan were aware of danger in Divisions 9, 10, and 1, and possibly a general threat throughout the jail, there is no evidence they had actual knowledge of an impending danger in the RCDC unit of Division 5. The summary judgment record demonstrates that Plaintiff did not make known that a threat of harm existed n the RCDC unit until he arrived at that unit and told the officers there. Such evidence does not support a claim against Thielen and Galan. *See Lewis*, 107 F.3d at 553 ("without such knowledge, defendants can hardly have been deliberately indifferent to [the inmate]'s safety").

Summary judgment is considered the stage of the case when a party "'must show what evidence it has that would convince a trier of fact to accept its version of events.'" *On-Site Screening, Inc. v. U.S.*, 687 F.3d 896, 899 (7th Cir. 2012) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Based upon the summary judgment evidence in this case, Plaintiff cannot convince a trier of fact that Thielen and Galan were actually aware of a threat in the RCDC unit in Division 5 where the attack occurred, and thus cannot establish that these Defendants acted with deliberate

indifference with respect to the threat of the attack that occurred there. Accordingly, summary judgment is granted for Thielen and Galan.

**Defendants Atkins, Walton, and Thomas:**

As to Defendants Atkins, Walton, and Thomas, however, there are disputed issues of material fact as to whether these officers were aware of an impending harm. Plaintiff testified in his deposition that, upon arriving at the RCDC, he told Sergeant Atkins and Officer Walton, "there's kites going around that the people are trying to kill me. I think some of those guys are in the bullpen right now." (R. 85, Exh. C, Pl. Depo at 108-09.) With respect to Sergeant Thomas, Plaintiff contends that, after he was in a bullpen, he told Thomas that some of the inmates in the bullpen were going to try to attack him and asked to be moved out of the bullpen. (*Id.* at 111.) Plaintiff also stated, "I know at one time, I told a sergeant (either Atkins or Thomas) that some of these guys are in here right now with me." (*Id.* at 109.) Although Walton and Thomas contend that they do not recall such conversations, (Defs. SOF ¶¶ 30, 39) (there is no affidavit or discovery responses from Sergeant Atkins in the record), viewing the evidence in a light most favorable to Plaintiff, there are disputed facts as to whether these officers were informed that Plaintiff was being placed or kept in a bullpen with inmates directed to harm him. Summary judgment cannot be granted for Defendants Atkins, Walton, and Thomas.

The Court reaches the same result regardless of whether Plaintiff requested protective custody. Even if Plaintiff did not ask for protective custody and "never wanted it," (Pl. Depo. at 114), viewing the evidence in Plaintiff's favor, Atkins, Walton, and Thomas were told that Plaintiff was in a bullpen with potential attackers and the officers neither removed him nor took other action to prevent an attack. Defendants rely on *Young v. Beattie*, No. 93 C 20146, 1995 WL 530256 (N.D. Ill. Sept. 5, 1995), where an inmate refused protective custody and was attacked 20 days later. The inmate in *Young*, however,

refused protective custody on the belief that he was being transferred the following day, and when the transfer never occurred, the inmate did not repeat his requests for protection. *Id.* at *3-4. Noting that "[n]o one was a better judge of plaintiff's safety than plaintiff himself,' the court in *Young* held that the inmate could not establish that others acted with deliberate indifference to his safety when he himself had not requested protective custody or to be moved for 20 days before the attack. *Id.* at * 4. According to Plaintiff in this case, he neither was given an alternative to protective custody nor was there a significant amount of time between his expression of a need for protection and his attack. Viewing the evidence in his favor, Defendants Atkins, Walton, and Thomas, unlike the officers in *Young*, were aware of an impending and immediate threat. Summary judgment is thus denied for Defendants Atkins, Walton, and Thomas.

**Defendant Hickerson:**

As to Superintendent Hickerson, Plaintiff alleges that Hickerson supervised the RCDC at the time that Plaintiff was attacked; that it was known that the RCDC had a high incident of violence; that inmates were regularly beaten, assaulted, stabbed, and killed there; that Hickerson was aware of such violence and that monitoring cameras in the RCDC did not work; but that he did nothing to prevent the violence. (R. 13, Am. Compl. at 8.) The Court allowed Plaintiff to proceed against Hickerson based on such allegations. Now that the parties have conducted discovery, it is clear that Plaintiff cannot demonstrate deliberate indifference against Hickerson, but at most only negligence or gross negligence.

In support of his allegations, Plaintiff submits Hickerson's discovery responses, in which he states that he was superintendent of the RCDC from November 2009 through July 2010, (R. 94 at p.51, Exh. E, Answers to Interrogatories ¶ 1), and provided for the general welfare and security of inmates in his division. (R. 94 at 49, Exh. E, Hickerson Responses to Requests for Admissions ¶ 24.)

Hickerson acknowledges that there were five to six inmate fights in the RCDC during the time he was superintendent and that, at the time of Plaintiff's incident, the cameras in the RCDC were not functioning. (R. 94 at 46, 52, Request for Admission Answer ¶ 8; Interrogatory Answer ¶ 2.) However, he denies knowing of stabbings and killings in the unit as alleged by Plaintiff, and he states that officers in his division maintained safety and security for detainees in accordance with the General Orders of the Cook County Department of Corrections. (R. 94 at 46, Interrogatory Answers ¶¶ 3, 5-7.) According to Officer Walton, well-being checks of the RCDC bullpens were conducted every 15 to 20 minutes, (R. 85, Exh. D, Walton Aff. ¶ 8), and Plaintiff testified that within 20 to 30 minutes after he was placed in the bullpen, he saw Officer Thomas walking through the RCDC area. (R. 85, Exh. C, Pl. Depo. at 111.) Furthermore, it appears undisputed that, at the time of the attack on Plaintiff, Walton was in close enough proximity to hear it, at which time he went to the bullpen and removed Plaintiff. (Walton's Aff. ¶¶ 14-18.)

Such evidence at best may establish negligence with not providing working cameras or additional security, but not that Hickerson was aware of constant fights, stabbings, and deaths, but did nothing to prevent them. Deliberate indifference "requires a showing of more than mere or gross negligence." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012). The summary judgment evidence thus demonstrates that Plaintiff cannot establish "the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012), quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Accordingly, summary judgment is granted for Defendant Hickerson.

**CONCLUSION**

For the reasons stated in this opinion, Defendant's motion for summary judgment [83] is granted in part and denied in part. Summary judgment is granted for Defendants Sergeant Thielen, Lieutenant Galan, and Superintendent Hickerson. The claims against these Defendants are dismissed and they are dismissed from this case. Summary judgment is denied for Defendants Sergeant Atkins, Sergeant Thomas, and Officer Walton, and Plaintiff may proceed with his claims against these Defendants. The motion to strike Plaintiff's declaration statements that he requested protective custody [99] is granted, and these statements are stricken and the Court has not considered these statements in deciding the summary judgment motion.

ENTER:

**Elaine E. Bucklo**
**United States District Court Judge**

**DATE: November 14, 2012**